**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PATRICK JAMES and EDWARD JAMES,<br><br>Defendants. | Case No.: 1:26-CR-29 (AT) |

**DEFENDANT EDWARD JAMES'S MOTION TO PRECLUDE THE INTRODUCTION OF UNTIMELY DISCLOSED EVIDENCE AND COMPEL PRODUCTION OF DISCOVERY**

BRACEWELL LLP
31 West 52nd Street
Suite 1900
New York, New York 10019
(212) 508-6100

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 2

I. The Government's Rush to Indict and Adoption of First Brands' Allegations .......... 2

II. The Government's Unjustified Deference to First Brands' Determinations of What Documents to Collect and Produce .......... 6

III. The Government's Untimely Productions .......... 8

LEGAL STANDARD .......... 10

ARGUMENT .......... 12

I. The Government Should Be Precluded From Making Use of Its Untimely Productions .......... 12

II. The Government Should Be Compelled to Produce Certain Highly Material First Brands Documents Under the Existing Grand Jury Subpoena .......... 18

A. The Government Should Be Ordered to Produce the Invoices and Other Representations Underlying the Alleged Schemes Regarding Accounts Receivable Factoring and Accounts Payable Financing .......... 19

B. The Government Should Be Ordered to Produce Complete First Brands' Custodial Files for Mr. James and Stephen Graham .......... 23

C. The Government Should Be Ordered to Provide an Adequate Privilege Log .......... 25

CONCLUSION .......... 28

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States v. Anderson*,
416 F. Supp. 2d 110 (D.D.C. 2006) ..... 11

*United States v. Aryeetey*,
168 F.4th 138 (2d Cir. 2026) ..... 16

*United States v. Beckford*,
962 F. Supp. 748 (E.D. Va. 1997) ..... 11

*United States v. Fancher*,
195 F. Supp. 448 (D. Conn. 1961) ..... 19

*United States v. Gallo*,
654 F. Supp. 463 (E.D.N.Y. 1987) ..... 11

*United States v. Giffen*,
379 F. Supp. 2d 337 (S.D.N.Y. 2004) ..... 19

*United States v. Jordan*,
316 F.3d 1215 (11th Cir. 2003) ..... 11

*United States v. Mason*,
No. 06-CR-80 (NRB), 2008 WL 281970 (S.D.N.Y. Jan. 25, 2008) ..... 16

*United States v. McElroy*,
697 F.2d 459 (2d Cir. 1982) ..... 10

*United States v. Miranda*,
526 F.2d 1319 (2d Cir. 1975) ..... 16

*United States v. Richards*,
659 F.3d 527 (6th Cir. 2011) ..... 11

*United States v. Stein*,
488 F. Supp. 2d 350 (S.D.N.Y. 2007) ..... 11

*United States v. Stevens*,
985 F.2d 1175 (2d Cir. 1993) ..... 11

*United States v. Thomas*,
No. 2:25-CR-33, 2026 WL 1972091, (D. Vt. July 8, 2026) ..... 17

*United States v. Trevino*,
556 F.2d 1265 (5th Cir. 1977) ........ 19

*United States v. Urena*,
989 F. Supp. 2d 253 (S.D.N.Y. 2013) ........ 11

**Statutes**

Jencks Act ........ 17

**Rules**

Fed. R. Crim. P. 12.2 ........ 11

Fed. R. Crim. P. 16 ........ *passim*

Fed. R. Crim. P. 17 ........ 18

Federal Rule of Evidence 502 ........ 25

**Other Authorities**

*First Brands to Wind Down After Bankruptcy Plan Blocked*, WALL STREET JOURNAL (Aug. 24, 2026) ........ 7, 8

## PRELIMINARY STATEMENT

The government has failed, repeatedly, to meet its most basic Rule 16 obligations. It has broken promises to both the defense and the Court regarding when it would complete its document production. The materials it has produced remain woefully incomplete. On April 30, 2026, in response to the Court's directive that the government state when it expected to complete discovery, the government represented that its "production of Rule 16 discovery is *substantially complete*," and that it "anticipate[d] producing the limited remaining materials in its possession no later than June 1." Dkt. 53 at 1. Yet four months later, those representations have proven hollow. The government has produced hundreds of thousands of documents since April 1, and far from "limited," its post-June 1 productions have been substantial. More troubling still, the government has made clear that it has yet to produce, or even review, significantly more discoverable material: it has still has not even completed its responsiveness reviews for any of the outstanding search warrants covering Mr. James and his brother.

This pattern is unsurprising given the way the government has elected to prosecute this case. Its investigation is little more than a re-telling of First Brands' bankruptcy filings, which it adopted before completing its investigation. The indictment was secured within months of the company's collapse, built upon document productions selectively curated by First Brands itself. The government apparently never insisted on any systematic collection from First Brands and does not appear to have gathered even the very representations and communications that First Brands identified as relevant. Nor has the government demanded a privilege log from First Brands. Having predicated its indictment on First Brands' own narrative of events, the government has demonstrated no urgency or intention in testing that account against documents and other information that could confirm or refute it—including potentially exculpatory materials concerning Mr. James. These failures warrant relief under Rule 16.

First, the government should be precluded from making use of its untimely productions. Having disregarded the promises it made about when document production would be finished, the government should be barred from introducing as evidence any materials seized pursuant to three search warrants, described below, that have not been produced as of the date of this motion. Without this relief, Mr. James's trial preparation will remain hostage to black letter discovery rules the government continues to ignore, with no end in sight.

Second, the government should be compelled to produce certain highly material First Brands documents that remain outstanding from the company under the government's grand jury subpoena. Despite charging Mr. James with wire fraud and bank fraud premised on the submission of fraudulent invoices, the government appears to have permitted First Brands to withhold the actual invoices and related communications. The government's wholesale deference to First Brands' determinations about which documents to collect and produce compromises Mr. James's right to a fair trial. Mr. James's specific requests for important categories of additional information are plainly material to his defense.

## BACKGROUND

### I. The Government's Rush to Indict and Adoption of First Brands' Allegations

Mr. James is a former executive of First Brands, which was a leading global supplier of aftermarket automotive parts, including brakes, filters, wipers, lights, and other products. *See* Indictment ¶¶ 4-6. Founded in 2013, First Brands served large automotive retailers, wholesale part distributors, and the world's largest commercial retailers, ultimately generating billions in annual sales. *See id.* ¶¶ 3-4. Mr. James resigned from the company on or about September 25, 2025.

On September 28, 2025, First Brands and various affiliates filed for Chapter 11 bankruptcy in the Southern District of Texas, prompting extensive public reporting on apparent irregularities in the company's financial statements and financing arrangements. Nine days later, the United

States Attorney's Office for the Southern District of New York issued a grand jury subpoena in this matter. Based on the limited information that has been disclosed to the defense regarding the government's service of grand jury subpoenas process, the government appears to have demanded the production of documents specifically by reference to assertions made by First Brands in the bankruptcy. *See, e.g.* Ex. A (reflecting request for "documents and communications related to the prepetition restructuring efforts referenced in the [First Brands' Chief Restructuring Officer] Declaration (e.g., paragraph 79)").[1]

On November 3, 2025, First Brands filed an adversary proceeding against Patrick James ("Patrick") on the basis of alleged improprieties in connection with First Brands' accounts receivable factoring and inventory financing practices, as well as the alleged falsification of First Brands' financial statements. *See* Ex. B. On January 9, 2026, First Brands filed a separate adversary proceeding against Mr. Edward James and one of First Brands' inventory financers. *See* Ex. C. And on January 19, 2026, First Brands amended its adversary complaint against Patrick to include, among other things, allegations regarding the company's supply-chain finance practices. *See* Ex. D.

At the same time that First Brands was developing and prosecuting its civil claims, it was providing the government curated document productions produced pursuant to a grand jury subpoena, with the company directing the government to particular [redacted] *See* Ex. E; Ex. F; Ex. G. And government search warrant applications during this time were expressly premised on the review of [redacted] Ex. H ¶ 9.

[1] Exhibits cited herein are attached to the Declaration of Seth D. DuCharme, filed herewith. Any document submitted with this motion bearing the Bates prefix "SDNY_JAMES" or "USAO_SDNY" were produced to the defendants by the government.

On January, 27, 2026—less than four months after the Southern District issued a subpoena—the government obtained a nine-count indictment against Patrick and Mr. James, one that inescapably reads like a clunky reworking of First Brands' bankruptcy filings rather than an independently investigated and organized criminal pleading.[2] For example, the table below compares, sentence-by-sentence, First Brands' description of the company's factoring practices in the bankruptcy with the government's modestly reworked description in the Indictment that followed:

| First Brands' Bankruptcy Filing | Indictment |
| --- | --- |
| "The Company historically entered into two types of factoring arrangements, including (i) factoring arrangements with customers and their financial institution partners ('Customer Factoring') and (ii) factoring arrangements with unaffiliated third parties ('Third-Party Factoring')." | "First Brands used two forms of receivable factoring: customer-linked factoring and third-party factoring." |
| "Under the Customer Factoring arrangements, … the Company would sell receivables to financial institutions that parter with their customers in exchange for near term payment …." | "Under customer-linked factoring, … a bank or financing company affiliated with that customer paid First Brands relatively quickly …." |
| "When the receivables later became due, the customer may pay the receivable to the financial institution directly, instead of payment coming from the Company." | "When invoices ultimately came due, the customer then paid the bank or financing company directly, rather than First Brands." |
| "Under the Third-Party Factoring arrangements, the Company would sell a receivable to an unaffiliated third-party factor (i.e., a factor that had not partnered with a customer of the Company)." | "By contrast, when First Brands used third-party factoring, First Brands sold its customer invoices to finance companies unaffiliated with any customer." |
| "The factor would pay the Company for the receivable in the near-term, sometimes within seven (7) days . . . . Unlike the Customer Factoring arrangements, . . . the payment is required to be made directly by the Company to the Third-Party Factor, rather than the customer that owes the receivable." | "These factors advanced cash shortly after invoicing, but when customer invoices came due, First Brands—rather than the customer—remained responsible for collecting payment and remitting the full invoice amount to the factor." |

[2] As discussed below, the prosecution team in this matter also includes the United States Attorney's Office for the Northern District of Ohio (where First Brands was headquartered). The government's productions in this case show that that office and associated agents with the Internal Revenue Service and Homeland Security Investigations conducted investigatory activities concerning First Brands as early as 2023, including regarding the company's customs and tariff compliance, without ever bringing charges.

*Compare* Ex. I ¶¶ 69–71 *with* Indictment ¶ 16.

The government's adoption of First Brands' version of events extended to allegations of impropriety. The "four discrete strategies" that First Brands alleged Patrick "deployed . . . to perpetuate th[e] fraud and secure financing from third-party lenders" became the same "four fraudulent schemes" identified in the Indictment. *Compare* Ex. D ¶ 4, *with* Dkt. No. 103 at 3. Specifically with respect to accounts receivable factoring, First Brands alleged "three significant issues" with respect to the company's factoring practices: (i) invoices were submitted to factors that did not actually exist; (ii) factored invoice amounts were in excess of the amounts reflected in customers' orders; and (iii) "in many instances the same invoice was factored more than once." Ex. D ¶ 49. The government then incorporated this framework in the Indictment, alleging that "First Brands employees routinely submitted fake invoices, fraudulently inflated invoices, and double-pledged invoices." Indictment ¶ 12. Further allegations corresponding to First Brands' pleadings pervade the Indictment from beginning to end. *Compare* Ex. D ¶ 60 ("[I]nventory that was purportedly transferred by First Brands subsidiaries to the SPV Debtors … remained on the First Brands subsidiaries' balance sheets."), *with* Indictment ¶ 25 ("The James Entities pledged inventory … purported to be unencumbered but in fact was already subject to liens by, or otherwise pledged to, First Brands' senior lenders and remained on First Brands' balance sheet.").

The government made its hasty decision to indict having received from First Brands alone a swath of more than four million pages of documents over a period of less than three months, apparently satisfied in its ability to have adequately reviewed this material. It also reached its decision to bring charges when First Brands' productions were far from complete. By page number, more than 60% of First Brands' productions to the government in this case were made after the Indictment was returned. And while there was no need for the government to indict on

such an abbreviated timeline, it had every reason to subject First Brands' presentation of the evidence to careful scrutiny. The government's investigation of Mr. James was overt, and the government was in regular contact with counsel in the few short months leading up to the Indictment. There was no exigency in bringing this case that would justify failing to complete its investigation, and now having charged him, there is no justification in not providing the discovery materials to which he is entitled.

## II. The Government's Unjustified Deference to First Brands' Determinations of What Documents to Collect and Produce

In addition to First Brands actively pursuing litigation against both Patrick and Mr. James, the company sought to use the alleged fraud to explain its faltering prospects for a successful sale or reorganization. At the bankruptcy's outset, First Brands secured more than $1 billion in new debtor-in-possession financing on the basis that these funds would allow the company to "pursue and implement a value-maximizing transaction, and provide the runway needed to position the Company for long-term growth and success." Ex. I ¶ 17. As prospects for such a result faded, First Brands leaned on its allegations of fraud in attempting to explain its circumstances. *See* Ex. J ¶ 19 ("I am aware that certain administrative expenses have accrued during the course of these chapter 11 cases and remain unpaid. This is not surprising given the extraordinary circumstances under which these cases were commenced, including . . . unreliable books and records inherited from former management, fraud and allegations of embezzlement committed by prior leadership."). In addition, First Brands sought approval of a reorganization plan premised on the purported likelihood of recovering tremendous value through lawsuits against insiders and other parties. *See* Ex. K ¶¶ 228–29 (" . . . I believe the Litigation Trust will generate sufficient distributable value (i.e., more than $2 billion) to satisfy all such administrative and priority claims in full in cash, by the end of 2028."). These steps were taken at the same time that, according to public reporting,

lenders who had funded the bankruptcy said, "they were misled to believe First Brands could survive." *First Brands to Wind Down After Bankruptcy Plan Blocked*, WALL STREET JOURNAL (Aug. 24, 2026), https://www.wsj.com/pro/bankruptcy/first-brands-to-wind-down-after-bankruptcy-plan-blocked-b16bbb41.

At a minimum, the circumstances called for heightened attention to the manner in which First Brands' information was being collected and produced. Instead, the government's productions reflect the substantial latitude it has given First Brands (and other grand jury subpoena recipients) in gathering, identifying, and producing responsive documents. The government has foregone gathering the documents containing the representations underlying its fraud charges and other materials critical to establishing the truth or falsity of those representations. Further missing from First Brands' productions to the government are material communications from individuals referenced in the Indictment—including exculpatory communications from Mr. James himself—or which held central roles in the conduct alleged. Rather than require a systematic and appropriately comprehensive collection, there is every indication that the government was largely content to receive what First Brands decided was appropriate to provide. Among other things, the government appears to have deferred entirely to First Brands' judgment in withholding documents pursuant to the attorney-client and work product privilege, having not required First Brands to provide even a basic privilege log.

On April 8, 2026, considering these and other concerns regarding the government's discovery, Mr. James requested that the government disclose, among other things, specific categories of exculpatory or otherwise discoverable documents and data in the possession, custody or control of First Brands. *See* Ex. L. This request incorporated Patrick James's March 18, 2026 request for government disclosures and discovery. *See* Ex. M.

On May 19, 2026, the government responded to Mr. James's April 8 letter. *See* Ex. N. This letter incorporated the government's April 3 and April 17, 2026 responses to Patrick James's request by reference. *See* Ex. O. As to the defendants' requests regarding material and exculpatory information that would be in First Brands' possession, the government simply insisted that it "has obtained substantial FBG records and disclosed those records to the defense," and disclaimed any "obligation to obtain those records" which First Brands had not produced. *Id.* at 2, 4.

## III. The Government's Untimely Productions

Trial in this matter was initially set for July 13, 2026, and based on the government's representations regarding the anticipated timing of its productions, the Court set a May 1, 2026 deadline for the defendants' pretrial motions, with the expectation that the government would have "finished delivering discovery by that date." *See* Dkt. 26 (Feb. 4, 2026 Hr'g Tr.) at 3:8-11, 4:13-20. As of April 2026, the government continued to represent that it would be prepared to move forward with a July 2026 trial. However, as Mr. James explained in his April 12, 2026 motion for an adjournment, the government's position could not be squared with its production deficiencies up to that time and its inability to provide the defense with a date by which it expected to finish producing discovery. *See* Dkt. No. 44 at 2. Mr. James noted that the government had yet to produce responsive materials for, among other things, material seized pursuant to (i) an April 28, 2025 search warrant issued in the Northern District of Ohio directing Microsoft to disclose the contents of four First Brands employees' email accounts, including Mr. James's (the "Microsoft Warrant") and (ii) a February 20, 2025 warrant for Patrick James's personal email account (the "Patrick Email Warrant"). *Id.* at 5.

In its April 15, 2026 opposition, the government maintained that it "has and will continue to produce discovery on a timetable that enables [the defendants] to prepare for trial on [the then-existing] schedule." Dkt. 45 at 1. The government specifically represented that "[b]y April 27, the

Government will have produced nearly all the Rule 16 material in its possession." *Id.* at 2. With respect to the outstanding responsiveness reviews, the government asserted that those reviews had been slowed by Patrick James's requests regarding privilege screens. *Id.* at 4. Notwithstanding this complaint, the government stated that "[p]rior to [a then-scheduled] April 27 conference, the Government expects to have produced all but one responsive report," and that its "production will include the four First Brands inboxes for which the Government . . . obtained a warrant in March [sic] 2025." *Id.* at 5. "Thus," the government continued, it "expect[ed] that as of April 27, 2026, the sole remaining responsive report will pertain to Patrick James's personal emails," the review of which the government "expect[ed] to complete . . . promptly." *Id.* At that time, in addition to the unfinished responsiveness review of the Microsoft Warrant and the Patrick Email Warrant, a responsiveness review remained incomplete for a November 14, 2025 warrant issued in the Southern District of New York to disclose the contents of Patrick's and Mr. James's iCloud accounts (the "Apple Warrant").

On April 23, 2026, the Court ordered the government to inform the Court "when it expects to complete discovery." Dkt. No. 49. On April 27, 2026, the government produced materials responsive to the Microsoft Warrant (although its subsequent communications confirm the government's review of Microsoft Warrant materials is still ongoing). A few days later, in its April 30, 2026 filing in compliance with this order, the government represented that its "production of Rule 16 discovery is substantially complete." Dkt. No. 53 at 1. The government further stated that it "anticipates producing the limited remaining materials in its possession no later than June 1," "includ[ing] data identified as responsive to the search warrant of Patrick James's personal email account." *Id.*

The government's April 30, 2026 statements regarding the completeness of what it had produced at that time are belied by its subsequent productions, and it has fallen woefully and inexplicably short of its professed predictions as to when discovery would be complete. As discussed further below, since April 30, the government has produced substantially more than "limited . . . materials," and, most alarmingly, it is now September and the government has still not completed its responsiveness review in connection with the Microsoft Warrant (which the government stated would be finished in time for productions to be made to the defendants by *April 27*), the Apple Warrant (also purportedly anticipated to be complete in time for productions by *April 27*), *or* the Patrick Email Warrant (which the government said in April would be "complete[d] … promptly" for production *no later than June 1*). Nor is the government able to say when it expects these reviews to be complete, most recently representing, on August 21, 2026, that it would "endeavor to review those materials for responsiveness expeditiously." Ex. P.

**LEGAL STANDARD**

"Broad discovery contributes to the fair and efficient administration of criminal justice by providing the defendant with enough information to make an informed decision as to plea; by minimizing the undesirable effect of surprise at the trial; and by otherwise contributing to an accurate determination of the issue of guilt or innocence." *United States v. McElroy*, 697 F.2d 459, 463–64 (2d Cir. 1982) (quoting Advisory Committee Notes to the 1974 Proposed Amendments to Rule 16) (alteration omitted). This principle is reflected in Rule 16, "an important guarantor of simple fairness to defendants." *Id.* at 463.

Pursuant to Rule 16(a)(1)(E), the government must permit a defendant access to items "within the government's possession, custody, or control" that (i) is "material to preparing the defense," (ii) the government intends to use in its case-in-chief; or (iii) was "obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). "An item is 'material to preparing the

defense' under Rule 16 'if it could be used to counter the Government's case or bolster a defense.'" *United States v. Urena*, 989 F. Supp. 2d 253, 258 (S.D.N.Y. 2013) (quoting *United States v. Stevens,* 985 F.2d 1175, 1180-81 (2d Cir. 1993). The "'materiality standard of Rule 16 normally is not a heavy burden.'" *Id.* at 261 (quoting *United States v. Stein,* 488 F. Supp. 2d 350, 356 (S.D.N.Y. 2007)); *see also Urena*, 989 F. Supp. 2d at 261 ("'Too much should not be required in showing materiality.'") (quoting 2 Charles Alan Wright et al., *Federal Practice and Procedure Criminal* § 254 (4th ed. 2013)).

Importantly, Rule 16 "is intended to prescribe the minimum amount of discovery to which the parties are entitled, and leaves intact a court's discretion to grant or deny the broader discovery requests of a criminal defendant." *United States v. Richards*, 659 F.3d 527, 543 (6th Cir. 2011) (internal quotation marks omitted); *see also United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003) (same); *United States v. Anderson*, 416 F. Supp. 2d 110, 113 n.2 (D.D.C. 2006) (same); *United States v. Beckford,* 962 F. Supp. 748, 755 (E.D. Va. 1997) ("[N]umerous courts … have recognized that the discovery provisions in Rules 12.2 and 16(b) are not exclusive and do not supplant a district court's inherent authority to order discovery outside the rules."); *United States v. Gallo*, 654 F. Supp. 463, 471 (E.D.N.Y. 1987) ("The Advisory Committee on Rules explicitly stated that the amended Rule 16 was to define only the *minimum* amount of discovery mandated.") (emphasis in original). The criminal rules of procedure "are intended, and must be construed, to 'enhance a just determination,' not to inhibit it." *Id.* at 471.

If a party fails to comply with its Rule 16 obligations, the Court may "order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions," "prohibit that party from introducing the undisclosed evidence," or "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2).

## ARGUMENT

### I. The Government Should Be Precluded From Making Use of Its Untimely Productions

The government's document productions in this case have been exceedingly untimely under any standard, including the one the government set for itself. Since representing on April 30, 2026, that "production of Rule 16 discovery is substantially complete" and that it "anticipates producing the limited remaining materials in its possession no later than June 1," Dkt. 53 at 1, the government has made the following productions, among others:

- May 12, 2026: Over 400,000 documents described as search warrant returns for the Microsoft Warrant. On April 15, 2026, the government had stated that it expected all such documents to be produced by April 27. *See* Dkt. 45 at 1. On May 12, 2026, the government further produced 2703(d) applications and orders that had been in the government's possession since January 2024. *See* Ex. Q.

- May 20, 2026: Over 58,000 documents representing only a partial production of documents responsive to the Patrick Email Warrant. *See* Ex. R.

- June 22, 2026: 218 documents produced to the government by KeyBank on March 25, 2026. *See* Ex. S; Ex. T.

- August 18, 2026: Multiple spreadsheets containing hundreds of rows of data or more reflecting a search of wire records that had been produced to the government by the Federal Reserve Bank of New York *more than seven months earlier*, in December 2025. *See* Ex. U; Ex. V. In addition, the government produced 19 documents concerning personal bank accounts held by Mr. James and his family that had been provided to the government by Huntington National Bank *nine and half months earlier*, on November 3, 2025. *See* Ex. W.

- September 2, 2026: 396 pages of communications between Patrick and Andrew Brumbergs—one of only two alleged co-conspirators of the defendants who have been identified by the government—which had been in the government's possession since *at least November 17, 2025*. *See* Ex. X. These communications were apparently produced to Mr. James only because the defense specifically asked for them, in a letter to the government dated August 28, 2026.

Even more inexcusable is the delay concerning the documents the government has yet to produce—or, indeed, to even review.[3]

In an August 11, 2026 letter to the government, counsel for Mr. James asked, "Has the government completed its responsiveness review of all search warrant returns? If so, when did it complete the responsiveness review for each warrant? If not, when does it anticipate completing those reviews and when does it intend to provide the complete set of responsive materials to the defense?" Ex. Y. As stated above, the government had previously stated that these reviews would be completed in time for productions to be made no later than April 27 (in the case of the Microsoft and iCloud Warrants) and June 1 (in the case of the Patrick Email Warrant).

On August 20, 2026, the government provided the defense with a list of records from the Microsoft and iCloud warrants over which a privilege assertion was not made by counsel for either defendant, stating the materials were "scheduled to be released to the prosecution team on Monday, [August] 24." Ex. Z.

In an August 21, 2026 letter, the government responded that "responsive reviews are ongoing." Ex. P at 1. The letter stated further that the government's filter team "just released approximately 27,000 documents to the prosecution team and expects to release an additional 105,000 documents next week." *Id.* at 1. The government did not say whether this constituted the full extent of search warrant returns that might be provided from the filter team to the prosecution team. In stating only that the filter reviews "are beginning to conclude," the government's letter suggests that more is to come. *Id.* at 1. And the government expressly raised the prospect of certain additional documents from the Microsoft Warrant being subsequently provided to the prosecution team. Specifically, it stated that First Brands had "provided a list of documents in those returns

[3] The government's failure to execute the Microsoft Warrant within a reasonable time is further addressed in Mr. James's Motion to Suppress Evidence Obtained Pursuant to Search Warrants, filed contemporaneously herewith.

over which they are asserting privilege," and that the government "has requested that First Brands provide document-level detail about the bases for their assertions," suggesting that the government may contest First Brands' designations. *Id.* at 2.

There is no credible justification for the government's failure to have completed its responsiveness review and produced search warrant returns to the government more than three—and in some cases four—months after it represented to the Court that it would, much less a justifiable excuse.

In attempting to account for its delay, the government asserted in its August 21 letter that "[t]he defendants' aggressive privilege assertions have considerably impeded the Government's review of seized records by prompting wide-ranging privilege screens and filter reviews." *Id.* at 1.

This contention is unconvincing for several reasons. First, Mr. James has done nothing with respect to privilege claims that could play any role in the government's delay. On March 25, 2026, the filter team made a production of more than 100,000 documents from the Microsoft and iCloud Warrant returns to Mr. James, asking that Mr. James review these documents and provide a privilege log asserting any applicable privilege within a little more than two weeks, by April 10, 2026. *See* Ex. AA. Mr. James provided his privilege log to the government on that date, which asserted privilege over fewer than 400 documents. In the more than four months since the defense provided that privilege log, the government has not raised any issue with the contents of the log or the assertions that it contains.

Having requested and received a privilege log from the defense on an expedited basis, the government took from April 10, 2026 until at least August 24, 2026 to make use of this information and provide documents for the prosecution team to *begin* its responsiveness review.

Second, the government provides no explanation as to why the defendants' privilege assertions would have so substantially impeded the government's review. Privilege screening and filter reviews are routine undertakings that should not, under any normal circumstances, have prevented the prosecution team from reviewing the materials at issue for such an extended period. Substantially more is required than the government's generic reference to supposed "aggressive privilege assertions." Ex. P. In addition, there is no reason at all why the government could not have completed its review of the almost 100,000 documents over which Mr. James did *not* assert privilege.

Finally, the government is in no position to shift the blame for its discovery failure to the defendants. At the time the government provided its anticipated production dates to the defendants and the Court, it was already aware of the scope of the defendants' privilege assertions. In its April 15, 2026 opposition to the defendants' motion to adjourn, the government made the same complaint regarding responsiveness reviews having purportedly "been slowed" by Patrick's privilege assertions. Dkt. 45 at 4. It, nonetheless, in the same paragraph, proceeded to say that it expected to have produced "all but one responsiveness report"—for the Patrick Email Warrant—by April 27, 2026. Remarkably, more than four months later, the government's responsiveness reviews for the Microsoft Warrant and Apple Warrant (as well as the Patrick Email Warrant) remain outstanding. The government refuses to say even when it believes these reviews will be completed, after having said in April that it expected all productions being completed by June 1. The government has provided no explanation as to why privilege assertions made clear to the government in the spring, before its representations to the Court as to the timeline for discovery, have now dramatically changed its ability to comply with its Rule 16 obligations.

"[W]hen the government has failed to comply with Rule 16, the district court has broad discretion to determine what remedial action, if any, is appropriate." *United States v. Aryeetey*, 168 F.4th 138, 143 (2d Cir. 2026) (internal quotation marks omitted). "'Whether or not sanctions for nondisclosure should be imposed depends in large measure upon the extent of the government's culpability for failure to make disclosable material available to the defense, on the one hand, weighed against the amount of prejudice to the defense which resulted, on the other.'" *United States v. Mason*, No. 06-CR-80 (NRB), 2008 WL 281970, at *3 (S.D.N.Y. Jan. 25, 2008) (quoting *United States v. Miranda*, 526 F.2d 1319, 1324-25 (2d Cir. 1975).

Here, the government's failures are many and clear. The government represented to the parties and to the Court—including in response to a specific Court order requesting the government's anticipated date for completing its productions—that these documents would have been produced more than three months ago (with respect to the Microsoft Warrant and the Apple Warrant) and four months ago (with respect to the Patrick Email Warrant).

So too is the prejudice faced by Mr. James. Trial in this case is set for early February 2026—a date set after the defendants sought an adjournment that the government opposed, maintaining in April that it would be ready for trial in July. Mr. James's liberty rights are at stake, and he has been inexcusably denied access to manifestly material documents that have been in the government's possession for up to 16 months. *See Mason*, 2008 WL 281970, at *3 ("[T]he government's cavalier approach to its discovery obligations would warrant scrutiny and a response because it cannot be reasonably concluded that there is no prejudice to the defendants from the fact that they did not have this information for the better part of a year or more."). Indeed, the government has put the defense in the position of seeking specific materials that it knows to be in the government's possession and clearly within the scope of Rule 16 and, only then, complying

with its Rule 16 obligations. For example, on September 2, 2026, after a specific demand from the defense, the government produced hundreds of pages of communications between Patrick and cooperating witness Andrew Brumbergs. It is hard to imagine that the government will not select some or all of these communications between the lead defendant and its cooperating witness as government exhibits at trial. And yet, if the defense had not asked for these highly relevant materials specifically, it is unclear when the government would have produced them, if at all.

Alarmed by the government's apparent failure to produce core Rule 16 material, the defense, in a letter dated August 28, 2026, asked the government to confirm that it "has produced all communications between alleged co-conspirators (including Patrick James, Edward James, Andrew Brumbergs, and Stephen Graham) within the Government's possession, custody, or control," and if the government was withholding those communications, to provide a basis. Ex. QQ at 2. These are statements of the defendants themselves, so the Jencks Act provides no shelter for the government. In a boilerplate letter on September 3, 2026, the government provided only the following statement: "The Government is aware of its obligations under Rule 16, *Brady*, and *Giglio* and has disclosed or will disclose these materials at the appropriate time." Ex. RR at 2. As the "appropriate time" has passed, the defense takes no comfort whatsoever in this bare representation.

The failures recounted above are precisely the circumstances that warrant preclusion. In *United States v. Thomas*, for example, preclusion was ordered where "[t]he Government represented in October that any additional Rule 16 discovery would be 'very little' and 'minimal,' and in November it told the court there was no ordinary post-indictment discovery to be produced with respect to the Superseding Indictment," only for "[t]hose representations [to be] later contradicted by productions in November, December, and May." No. 2:25-CR-33, 2026 WL

1972091, at *5 (D. Vt. July 8, 2026). Here, the government has already—time and again—produced highly material documents after the dates on which it represented that productions would be complete. In the interest of ensuring due process and preserving the integrity of these proceedings, the government should be precluded under Rule 16(d)(2)(C) from introducing as evidence materials seized pursuant to the Microsoft Warrant, Apple Warrant, or Patrick Email Warrant, or co-conspirator communications in the government's possession, that the government has not produced as of the date of this motion.

In the alternative, should the Court determine that preclusion is not appropriate at this time, Mr. James requests that pursuant to Rule 16(d)(2)(A), the Court set a reasonable date certain and well in advance of trial by which the government must produce relevant discovery material, imposing that any Rule 16 materials that remain undisclosed after that date are subject to preclusion.

## II. The Government Should Be Compelled to Produce Certain Highly Material First Brands Documents Under the Existing Grand Jury Subpoena

The government's manifest deference to First Brands' determinations regarding what documents to collect and produce, and the resulting deficiencies in the government's own productions, compromise Mr. James's right to a fair trial. Despite the breadth of the government's failings in collecting material information under its own subpoenas, Mr. James's requests in this motion are discrete and directed towards the most material missing documentation.[4] Mr. James seeks only (1) the invoices and other representations underlying the alleged accounts receivable factoring and accounts payable financing schemes; (2) the complete sets of electronic communications and other documents of Mr. James and Stephen Graham; and (3) a privilege log

[4] Mr. James reserves all rights to seek further relief to which he may be entitled under the criminal rules or otherwise, including Rules 16 and 17.

sufficient to allow the parties, the government, and the Court to evaluate First Brands' bases for withholding documents.

To the extent the government has not reviewed or does not currently possess these materials, it undoubtedly can obtain them. Indeed, the government continues to issue grand jury subpoenas related to this case, so is well aware that it retains its ability to issue compulsory process, so long as that process is not an abuse of the grand jury. Moreover, "[d]ocuments that the Government . . . has access to must be provided to aid a defendant in preparing his defense." *United States v. Giffen*, 379 F. Supp. 2d 337, 343 (S.D.N.Y. 2004); *see also United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977) (evidence that is not in the government's physical possession but is accessible to the government must be turned over to the defense). This principle applies with particular force where, as here, the government has chosen to proceed on a theory substantially supplied by First Brands while declining to ensure that the underlying records were collected in a complete and evenhanded manner. The defense should not be required to prepare for trial based on First Brands' curated narrative while the documents necessary to test that narrative remain uncollected, unreviewed, or withheld without meaningful scrutiny. These documents are material, and their production is necessary to ensure Mr. James's right to a fair trial. Moreover, even if these documents fall outside Rule 16's broad scope, the Court may nonetheless order their production in the interest of justice. *See United States v. Fancher*, 195 F. Supp. 448, 456 n.18 (D. Conn. 1961) (noting that even where Rule 16 may not apply, "courts remain free to direct discovery under their inherent authority to administer criminal justice in federal courts").

### A. The Government Should Be Ordered to Produce the Invoices and Other Representations Underlying the Alleged Schemes Regarding Accounts Receivable Factoring and Accounts Payable Financing

Despite charging Mr. James with four counts of wire fraud affecting a financial institution and three counts of bank fraud, the Government has inexplicably permitted First Brands to

withhold the actual representations underlying these claims, and other documents referenced in the Indictment itself that are critical to establishing whether these representations were true.

Much of the government's allegations center around invoices, yet few actual invoices appear to have been produced. The alleged accounts receivable factoring scheme consisted of "First Brands employees routinely submit[ting] fake invoices, fraudulently inflated invoices, and double-pledged invoices for the purpose of selling and pledging them to factoring counterparties as if they represented valid, collectible receivables from customers." Indictment ¶ 12. Presumably, then, material evidence would include the invoice submissions that First Brands made to the factors, as well as First Brands' "actual" customer invoices. Given that there is a significant allegation by the government that invoices were altered or faked, the ability of the defense to examine those invoices is clearly crucial. However, neither the invoice submissions nor the customer invoices themselves have been produced by the government.

With respect to First Brands' customer invoices, the government confirmed in its recently filed opposition to the defendants' motions for a bill of particulars that what it has produced are not invoices, but rather what it refers to as "internal First Brands' data of authentic receivables." Dkt. 103 at 31. These three documents are spreadsheets, apparently prepared for First Brands' advisors in the bankruptcy—Alvarez & Marsal, generally referred to as A&M. The file names indicate that the documents were created "for AM.". *See* FBG_DOJ_00026057 through FBG_DOJ_00026078.[5] The documents' metadata shows they were created on November 14, 2025, the same week that a hearing was held on First Brands' motion for a preliminary injunction in its adversary proceeding against Patrick.

[5] This "Vizion data" for factored receivables appears to contain information regarding 6,452,235 invoices issued by First Brands from only 2023 to 2025.

While the government describes these documents as "Vizion data containing authentic sets of receivables," Dkt. No. 103 at 31, no actual "receivables" or "invoices" are included. Instead, Vizion is a "data aggregation platform" that was used by First Brands to "pull and aggregate customer invoice data from various [Enterprise Resource Planning] systems across FBG entities." Ex. BB at 15. In other words, it is software intended to consolidate data regarding First Brands invoices, not the invoices themselves.

In a criminal matter where the word "invoice" or "invoices" appears 45 times in the Indictment, the government's apparent satisfaction in relying on aggregated data rather than the actual invoices is indefensible. This is particularly the case given First Brands' self-described "unreliable books and records." Ex. J ¶ 19. Moreover, the reliability of Vizion specifically has been questioned. As explained in an expert declaration filed in the bankruptcy on behalf of one of First Brands' factors, "I have been informed that the Debtors' various business units are not well integrated from a technological and records perspective and the Debtors' different subsidiaries and units use different accounting systems to track when invoices are issued and products are shipped." Ex. CC ¶ 10. "[M]y understanding is that Vizion 'scrapes' invoice data from many different accounting systems, and it is possible that errors or processing issues might explain some discrepancies between Vizion and PrimeRevenue," the platform used by the factor to purchase First Brands receivables. *Id.* at ¶ 20. This testimony highlights the untenability of allowing purported "Vizion data" gathered for First Brands' bankruptcy advisors to substitute for the actual invoices themselves.[6]

---

[6] Unsurprisingly, from the defense's review to date, the few actual invoices included in the government's productions are those which First Brands decided to highlight in its bankruptcy submissions. *Compare* Ex. DD (Brake Parts Inc Invoice No. 6328084), *with* Ex. EE (the same invoice, containing First Brands' bankruptcy exhibit stamp).

The government's collection of what was actually submitted to the factors is no better. The Indictment describes how First Brands allegedly "generated" "invoices . . . for transactions that had never occurred," "while in other[ instances] the dollar amounts on invoices were altered to make them appear more valuable." Indictment ¶ 12. And yet, the government permitted First Brands to omit these alleged "fake invoices, fraudulently inflated invoices, and double-pledged invoices" from its productions. *Id*. Instead, the government has pointed Mr. James to First Brands' production of "listings of factored receivables from third parties" that the government suggests may be used "for comparison purposes" in conjunction with the Vizion data. Dkt. 103 at 26. But these listings, like the Vizion data, are neither the actual contemporaneous representations, nor documents prepared in the ordinary course. Like the Vizion data, they appear to have been created in November 2025 for purposes of the bankruptcy. *See, e.g.*, Ex. SDNY_JAMES_00184556 (bearing file name, "Evolution FBG AR vA&M.xlsx.").

The government has taken the same approach with respect to the alleged accounts payable financing fraud. This alleged scheme concerns First Brands' use of supply-chain financing, an arrangement under which "financial institutions advanced funds against invoices First Brands owed to its suppliers." Indictment ¶ 9. According to the government, "First Brands submitted false and misleading invoice information . . . to induce [these] financers to increase the amount of funds advanced." *Id.* ¶ 16.

In opposing Mr. James's motion for a bill of particulars, the government contended that the defendants "have all the tools they need to map out the particulars of the accounts-payable fraud, including by comparing veritable invoices issued *to* First Brands against cover invoices and invoice information submitted *by* First Brands to the four online platforms for supply chain financing." Dkt. No. 103 at 27-28. However, as best the defense has determined, the government

has not produced either the actual "veritable invoices issued *to* First Brands" or the actual "invoice information submitted *by* First Brands" to each of the platforms, as such information was submitted in the ordinary course. Unlike with respect to the alleged factoring fraud, the government has been unwilling to identify for the defense any examples of relevant materials among the more than 4.5 million documents that it has produced. *See* Ex. FF at 3; Ex. GG at 4 (refusing to identify any information on the basis that the request "appear[s] calculated to obtain a preview of the Government's trial proof").

**B. The Government Should Be Ordered to Produce Complete First Brands' Custodial Files for Mr. James and Stephen Graham**

The complete custodial files (e.g., their electronic communications and other materials) for Mr. James and Stephen Graham are among the most obvious sources of material evidence concerning the alleged schemes, First Brands' internal operations, and the context in which the charged conduct supposedly occurred. Mr. Graham's file is particularly important because he is a former First Brands executive with firsthand insight into the company's operations, an alleged co-conspirator who has pleaded guilty and is cooperating with the government, and therefore a central witness whose contemporaneous communications bear directly on both the government's theory and Mr. James's defense. Cover letters accompanying First Brands' productions to the government indicate that First Brands produced [redacted] Ex. HH. No such representations are made regarding the documents of Mr. James or Stephen Graham. With respect to their custodial files, First Brands affirms only that it produced [redacted] Ex. F; Ex. G.

Mr. James is a defendant in this case, alleged to have committed crimes solely in the course of his employment with First Brands. There can be no reason for Mr. James's First Brands

communications to be left on the table, in particular given First Brands' demonstrated willingness and ability to produce complete custodial files for Patrick and Brumbergs.

Moreover, the existence of certain communications collected pursuant to the Microsoft Warrant that do not appear in First Brands' productions confirm the existence of material communications it failed to produce in response to the government's requests. These include a January 2021 email exchange between Mr. James and an employee of LiquidX—a company that provided a platform used for First Brands' supply chain finance—regarding Mr. James's availability for an introduction with Evolution—an entity which went on to provide First Brands with supply chain financing. *See* Ex. II. First Brands' failure to produce this email chain—one between Mr. James and a supply chain finance platform provider regarding one of First Brands' supply chain financers—makes evident the company's failure to conduct a reasonable collection of Mr. James's communications.

As another example, the Microsoft Warrant returns include emails from April 2021 between Mr. James and a First Brands' finance executive, with three other First Brands' employees on the chain, regarding a financing with Onset Financial ("Onset"). [redacted] *See* Ex. JJ. Of the four First Brands employees included in the chain along with Mr. James, at least three have been interviewed by the government in its investigation of this matter, and two provided witness statements relied on heavily in a government search warrant affidavit. *See* Ex. KK; Ex. LL. And yet this email chain, although marked responsive by the government, was not included in First Brands' productions to the government.

A separate email chain from April 2021 shows [redacted]

[redacted] Ex. MM. The document is exculpatory. [redacted] *Id.*

Not only did First Brands fail to produce any of these documents, but all three were necessarily evaluated by the government as part of its review of the Microsoft Warrant returns and determined to be responsive. And yet, the government appears to have taken no action to remedy the gaps in First Brands' productions and obtain a complete set of Mr. James's relevant documents.

In addition to the custodial file of Mr. James, the complete custodial file for Graham—along with Brumbergs and Patrick, the only alleged co-conspirators yet identified by the government—should be collected and produced to the government.

**C. The Government Should Be Ordered to Provide an Adequate Privilege Log**

First Brands production cover letters to the government further make clear the need for a privilege log sufficient to assess First Brands' withholding of documents for privilege.

With every production, First Brands asserted that [redacted] Ex. NN.

Other productions purported to include [redacted]

[redacted] Ex. PP. Thus, at a minimum, First Brands was asserting the attorney client privilege over communications with one of the financial institutions most involved in the alleged conduct, and communications with First Brands' independent auditor who features prominently in the Indictment. *See* Indictment ¶¶ 27, 32, 34.

This assertion of privilege over communications with critical third parties provides ample reason to verify First Brands' claims of privilege rather than accept them at face value. Communications involving investment bankers, auditors, financing counterparties, or other outside business participants are not categorically privileged merely because counsel may have been copied or involved, and the government could not responsibly assess whether First Brands' withholdings were proper without basic information identifying the nature, participants, and asserted basis for each claim. Further reason is demonstrated in the apparent absence of documents produced by First Brands that were redacted for privilege. Any considered privilege review in connection with a production of documents on the level of First Brands' productions in this case would identify numerous communications that are only privileged in part. That is, of course, particularly the case with respect to documents produced by a large company with heavily involved in-house attorneys who might wear "multiple hats," providing both legal and business advice at different times. Nonetheless, the defense has identified few if any documents produced by First Brands that were redacted for privilege (it is not clear who redacted them and on what basis), strongly suggesting that the company broadly withheld documents rather than conduct a careful and thorough review.

Indeed, the government never obtained even the most basic privilege log from First Brands. And in fact, of the more than 130 individuals and entities who have produced documents to the government, *only two* have provided the government with a privilege log.

If that were not enough to raise serious concerns, on August 21, 2026, the government revealed that First Brands had asserted privilege over no fewer than 110,522 documents seized pursuant to the Microsoft Warrant, but that it had done so simply by listing Bates numbers rather than identifying any basis for the privilege assertions. This was evidently of concern to the government, who stated to Mr. James that it had requested "document-level detail about the bases for their assertions." That log still has not been produced.

Accordingly, Mr. James respectfully requests that the Court direct the government to immediately obtain and produce from First Brands (1) actual invoices and other representations underlying the alleged accounts receivable factoring and accounts payable financing schemes; (2) complete First Brands custodial files for Mr. James and Stephen Graham; and (3) an adequate privilege log reflecting documents withheld by First Brands.

The government's untimely discovery productions and repetitive outright failures threaten Mr. James's right to a fair trial and his preference for a speedy one. The government has disrupted the orderly administration of justice by compromising the Court's interests in judicial economy and efficiency as well, as the defense will have no choice but to continually raise these late discovery issues seriatim, requiring, as now, the Court's repeated interventions to compel the government to comply with its most basic obligations under the Federal Rules of Criminal Procedure. The government owes Mr. James, and this Court, a fair and smooth process in advance of trial. One sure way to ensure efficiency is to limit the government to the materials the government already has produced, which it presumably believed to be sufficient to indict Mr. James and prove its case beyond a reasonable doubt in January 2026. It is difficult not to infer that the government's investigation was a fishing expedition in which they cast their line wherever the

parties in the bankruptcy had thrown theirs. And having embarked on their fishing expedition, the government appears now to have almost no idea of what it caught in its net.

**CONCLUSION**

For the reasons set forth above, Mr. James respectfully requests that the Court enter an order: (1) precluding the government from introducing at trial any materials seized pursuant to the Microsoft Warrant, Apple Warrant, or Patrick Email Warrant that have not been produced as of the date of this motion; or, in the alternative, setting a date certain by which all such materials must be produced, with any later-produced materials subject to preclusion; (2) compelling the government to obtain and produce the invoices and other representations underlying the alleged accounts receivable factoring and accounts payable financing schemes; (3) compelling the government to obtain and produce the complete First Brands custodial files for Mr. James and Stephen Graham; (4) requiring the government to obtain and produce an adequate privilege log for documents withheld by First Brands; and (5) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 4, 2026

Respectfully submitted,

BRACEWELL LLP

By: /s/ Seth D. DuCharme
Seth D. DuCharme
Nicole Boeckmann
David A. Shargel
31 West 52nd Street, 19th Floor
New York, New York 10019
(212) 508-6100
seth.ducharme@bracewell.com
nicole.boeckmann@bracewell.com
david.shargel@bracewell.com